## LAKE ERIE & W. R. CO. v. MICHIGAN CENT. R. CO.

(Circuit Court, D. Indiana.    April 30, 1898.)

### No. 8,698.

**1. SPECIFIC PERFORMANCE—UNCERTAINTY.**
    The witnesses for the complainant testified to a verbal agreement by which the defendant granted it the use of a certain bridge, passenger station, and tracks.    The complainant was unable to show the terms on which it was to use the station, or the amount of the track that was granted, except the right to use all necessary terminals.    The general superintendent of the defendant, with whom the agreement was alleged to have been made, contradicted the testimony, while the documentary evidence pointed to the absence of any definite arrangement between the parties.    *Held*, that no definite agreement capable of being enforced was entered into.

**2. STATUTE OF FRAUDS—FRAUD OF REAL ESTATE—POSSESSION.**
    Possession sufficient to take a verbal grant of the use of lands out of the statute of frauds must be open, notorious, and exclusive, taken under the contract, and referable to it; and where one is already in possession a continuance under the contract is not sufficient, nor is possession in common with the grantor.

W. E. Hackedorn, John B. Cockrum, and Miller & Elam, for complainant.

Winston & Meagher, for defendant.

BAKER, District Judge.    This is a suit founded on a verbal agreement, whereby, for an executed consideration of valuable property rights moving from the complainant to the defendant, the latter agreed that the complainant "should have the right to forever use the bridge and tracks of the defendant west of Trail creek to its freight and passenger depots in Michigan City, and to use said depots, and the right to store its passenger cars upon said tracks west of Trail creek, without paying any rental or other charge therefor to the defendant."    The prayer of the bill is that the court on the final hearing will quiet and set at rest forever the title of the complainant in and to the bridge and the approaches thereto, and the tracks and depots lying west of Trail

creek, except in so far as the defendant may be entitled to use the same jointly with the complainant. The defendant denies the making or existence of any such agreement, and also claims the benefit of the statute of frauds. The verbal agreement concerns and purports to grant such an interest in real estate as to bring the case within the terms of the statute, unless the complainant has proved such part performance as to take it out of the statute. The Lake Erie & Western Railroad Company, and each of the companies through or from which it derives its rights, will be hereinafter designated as the complainant. The agreement is alleged to have been made in the summer of 1878, and it involves such important and lasting rights that we should naturally expect that it would have been reduced to writing. Mr. Malott, who was the vice president and general manager of the complainant, and who negotiated the agreement with Mr. Ledyard, the general superintendent of the defendant, says that the understanding was that the verbal negotiations were to be reduced to writing. No agreement embodying the terms of the verbal negotiations was ever reduced to writing or executed by the parties. Lord Chancellor Cranworth, in Ridgway v. Wharton, 6 H. L. Cas. 268, says:

"The circumstance that the parties do intend a subsequent agreement to be made is strong evidence to show that they did not intend the previous negotiations to amount to an agreement."

And Lord Wensleydale, in the same case (page 304), says:

"An agreement, to be finally settled, must comprise all the terms which the parties intend to introduce into the agreement. An agreement to enter into an agreement upon terms afterwards to be settled between the parties is a contradiction in terms. It is absurd to say that a man enters into an agreement till the terms of that agreement are settled. Until its terms are settled, he is perfectly at liberty to retire from the bargain."

The same doctrine is affirmed and applied in the case of Lyman v. Robinson, 14 Allen, 242, 254. The pertinence of this principle is at once apparent from the admission of Mr. Malott, who, on his cross-examination, says that at the time the agreement was entered into between Mr. Ledyard and himself he did not think there was any discussion of the terms upon which the complainant should have the right to use the station for freight or passenger business, or what it should pay for switching; and yet it is alleged in the bill as a term of the agreement that the complainant should have the right to use the freight and passenger depots without rental or other charge therefor. It does not appear that the complainant ever reduced the verbal agreement or negotiations to writing, or requested the defendant to execute the same. But, conceding that these considerations would not preclude the maintenance of the bill, the court is still of the opinion that the agreement set out has not been proved by such clear and satisfactory evidence as would justify it in finding that the agreement set up in the bill had been entered into as alleged, and in enforcing it as prayed for. On his direct examination Mr. Malott testified that the complainant had a right of way on the side of Trail creek, and that it was necessary to remove the tracks, and to make quite a change in the tracks of the defendant's road as well as the complainant's, to enable the

bridge to be put in, and in consideration of that a proposition was made that, if the complainant would surrender its rights there, and use the defendant's bridge, the complainant should have free use of the structure. The complainant was to surrender the use of its tracks and right of way, and to remove the tracks and surrender the right of way to the defendant, from a point east of Franklin street to the west line of Trail creek. The agreement also covered a portion of the complainant's tracks east of Trail creek. The complainant was guarantied the use of the defendant's tracks to its depot. It was to be done without charge to the complainant. The understanding was that the arrangement was to continue for all time. On his cross-examination he testified that at the time this agreement was entered into between Mr. Ledyard and himself he did not think there was any discussion of the terms upon which the complainant should use the station for freight or passenger business, or what it should pay for switching. The understanding was entirely in regard to the bridge. The understanding was that the defendant was to take up the complainant's tracks in Front street so as to permit the necessary changes to be made to enable the defendant to reach the new bridge, and that for surrendering its right of way in Front street and taking up its tracks the complainant should have a perpetual use of the bridge, a perpetual use of certain tracks of the defendant, and the complainant was to take down its bridge, and certain tracks were to be set apart for its use. The witness cannot say how much track was to be set aside for complainant's use. He says that he cannot give any sort of an estimate.

The foregoing embodies all the testimony of the party who claims to have made the agreement on behalf of the complainant, in regard to its terms. A fair construction of this testimony leaves every part of the alleged agreement uncertain and indefinite except so much as relates to the right to use the bridge. The court, if this testimony stood alone and uncontradicted, would not be authorized to enforce the contract as it is alleged in the bill to have been made. The only additional testimony touching the terms of the alleged agreement is that of Mr. Walker. He was the agent of the complainant from 1871 to 1881, at Michigan City. He testifies that he accompanied Mr. Malott and Mr. Ledyard along the tracks, when the terms of the agreement were discussed, and says that he cannot say that he heard all of their conversation. The material part of his testimony in regard to the terms of the agreement is that Mr. Ledyard proposed to Mr. Malott that the defendant would construct the bridge at its own expense if the complainant would abandon its track west of Trail creek, and such portions as it might be necessary to abandon east of the creek; and in consideration of that the complainant should have the right to cross the bridge with its passenger and freight trains to the defendant's passenger and freight depots, and that, in lieu of the coach track which it surrendered, the defendant would construct a coach track on the northerly side of its yard west of Trail creek at a convenient place, with standing room sufficient to accommodate the com-

plainant's passenger coaches, the use of which it was to have without charge. On his cross-examination he says that there was no agreement entered into in his presence; no papers exchanged or made. His recollection is that, so far as the discussion went, the defendant was to make the change in its track, and to build the new drawbridge; and, after it had done all of this work, it was to allow the complainant to come in and use such terminals as were necessary for it to use without any compensation other than the surrender of its rights in Front street. If all that is stated by this witness is true, it would still be impossible for the court to adjudge the nature and extent of the use which ought to be decreed to the complainant. The agreement was to run forever, and the decree would have to ascertain and determine the nature and extent of the mutual rights of each party for all future time. The evidence adduced does not furnish such clear and definite data as would enable the court to frame a satisfactory decree.

This testimony on behalf of the complainant is contradicted fully and sharply by Mr. Ledyard, who testified on behalf of the defendant. But, if the court were of opinion that the testimony adduced by the complainant was so clear, certain, and precise that it would, standing alone and uncontradicted, furnish a sufficient basis on which a decree could be founded, it would not aid the complainant's contention for the reason that, in the opinion of the court, the documentary evidence produced on the hearing clearly shows that the discussion of the parties, if any took place, in the summer of 1878, went no further than preliminary negotiations which never resulted in a definite agreement or contract. The claim, and the only claim, on behalf of the complainant, is that the defendant granted the valuable rights and terminal facilities alleged to have been yielded to the complainant in consideration of its surrendering valuable rights of way and tracks west of Trail creek, consisting of a main track extending to the defendant's depots, and a side track, and a coach track, and a certain track on and rights in Front street east of Trail creek. The complainant's witnesses disagree as to the character and extent of this right of way and tracks. All agree, however, that no change was made in the rights and tracks of the complainant on either side of Trail creek from 1876 down to the time when the complainant claims to have surrendered them to the defendant. The defendant produced a number of witnesses whose testimony sharply conflicted with that of the complainant's witnesses on these subjects. On April 25, 1876. the two parties entered into a traffic agreement, which was in writing, and signed by David Macy as president of the complainant, and by H. B. Ledyard as general superintendent of the defendant. This agreement recites that the complainant had no depot grounds or terminal facilities at Michigan City, and that it desired to use the passenger and freight houses and the engine house of the defendant, and to have lumber and other freight destined to points on or reached by the complainant's road loaded on the tracks or in the freight house of the defendant. The agreement then proceeds to set out in detail the charges which the complainant was to pay for such service. A second agreement was executed by these parties on Aug-

ust 16, 1877, which was canceled by the defendant on October 5, 1878. This agreement recites that the complainant had no depot grounds or terminal facilities at Michigan City, and that it desired to use the passenger and freight houses, and round house, etc., belonging to the defendant at Michigan City, and to have access to the same over the tracks of the defendant, the complainant agreeing to pay the charges specified in the agreement for such service.

It is difficult to reconcile these solemn written admissions made by the complainant with the claim now set up. After so great a lapse of time, it is certainly safer to accept the truth of these admissions rather than to rely upon the vague and uncertain memory of witnesses whose testimony is sharply contradicted by other witnesses produced by the defendant. Nor is this all the written contemporaneous evidence strongly tending to show that no agreement was entered into, and that the complainant did not yield the consideration which it claims to have done. Mr. Walker, who was the agent of the complainant, was a member of the common council of Michigan City during the years 1878 and 1879, and he would be presumed to have been conversant with all that was done by the common council in reference to the change of tracks and the building of the drawbridge. The agreement set up by complainant is claimed to have been made in the summer of 1878. A written agreement was entered into between the defendant and the city of Michigan City on August 24, 1878, which was accepted and adopted by an ordinance of the common council of that city on September 12, 1878. This ordinance was duly accepted in writing by the defendant on October 5, 1878, and it explicitly binds the city of Michigan City to procure and cause to be vested in the defendant the title and ownership of, in, and to all necessary right of way for the contemplated change, including tracks, side tracks, frogs, switches, and other fixtures, without any unnecessary delay, and also all land and lots, and parcels of land and lots lying between the present right of way owned or occupied by the defendant, and the additional right of way to be obtained as aforesaid. If the defendant had acquired during the preceding summer, from the complainant, the right of way and tracks which it asserts it had surrendered to the defendant, it seems inconceivable that the defendant would have entered into the contract embodied in this ordinance, or that the city of Michigan City would have agreed to procure at its own expense rights which the defendant then possessed under the terms of the agreement set up in the bill. An ordinance adopted on October 28, 1878, which was duly accepted in writing by David Macy, as president of the complainant, on November 2, 1878, would seem to show conclusively that no such agreement as alleged in the bill was made in the summer of 1878. This ordinance recites that the complainant had, by agreement with the defendant, contracted to pay one-fourth of the cost of the drawbridge to be constructed across Trail creek. If a definite agreement had been entered into between the complainant and the defendant in the summer of 1878 whereby the defendant was bound at its own expense to build the bridge, and to furnish perpetual use of its tracks across the bridge to its passenger and freight depots to the complainant without charge, in consideration of the complainant surrendering its tracks

and rights as claimed, how could it be possible that on November 2, 1878, the complainant agreed to pay one-fourth of the cost of building the drawbridge? There is other documentary evidence in the record which strongly corroborates that to which the court has already referred. The court entertains no doubt that no definite agreement, such as is alleged in the bill, was ever made; nor does it believe that anything more occurred between the parties than mere inconclusive negotiations.

It is insisted that the complainant has used the bridge and tracks of the defendant, under the agreement set up in the bill, from the time the drawbridge was completed until 1891, when the present suit was brought, and that such use is cogent evidence of the existence of the contract claimed to have been made. The contracts hereinbefore referred to show that the complainant used and enjoyed the depots and terminal facilities of the defendant at Michigan City prior to and up to the time of the building of the drawbridge and the change of the tracks. The evidence shows that the complainant has continued to use and enjoy the same privileges since the drawbridge was built, substantially as it did before. In order that possession should be sufficient to take the case out of the statute, it must be open, notorious, and exclusive, and taken under the contract, and referable to it. Where one is already in possession, a continuance under the contract will not be sufficient. The possession must be open and notorious. Brawdy v. Brawdy, 7 Pa. St. 157; Moore v. Small, 19 Pa. St. 461; Brown v. Lord, 7 Or. 302; Charpiat v. Sigerson, 25 Mo. 63. It must be exclusive. Possession as the agent of the vendor is not sufficient to take the case out of the statute. Davis v. Moore, 9 Rich. Law, 215. Nor is possession in common of other lands of the vendor. Haslet v. Haslet, 6 Watts (Pa.) 464. Nor is possession in common with the grantor or vendor sufficient. Johns v. Johns, 67 Ind. 440; Wallace v. Long, 105 Ind. 522, 5 N. E. 666; Austin v. Davis, 128 Ind. 472, 26 N. E. 890. Possession held in common with the grantor is as referable to an agreement for use in subordination to the title of the grantor as it is to a paramount right or title in or to the property used by the parties in common. Hence such possession affords no evidence of any paramount right or title. Besides, the evidence shows that there was no substantial change in the use by the complainant of the tracks and terminal facilities of the defendant after the agreement set up in the bill is alleged to have been made.

The complainant has failed to make out a case entitling it to the relief prayed for. The bill must be dismissed, at the complainant's cost. The defendant shall be, and it is hereby, enjoined and restrained from molesting or disturbing the complainant in the use of the drawbridge and the approaches thereto, or in the use of the passenger and freight tracks and terminal facilities of the defendant, as the same have been used and enjoyed by the complainant during the pendency of this suit, for the period of 90 days from the entry of the decree herein; and if within that time the complainant shall prosecute an appeal from the decree of dismissal herein, this restraining order shall then, and in that event, continue and remain in force until the final hearing and determination of said appeal. So ordered.