Argued February 6, reversed April 16, 1969

# STRONG ET UX, *Respondents, v.* HALL, *Appellant.*

453 P2d 425

*Mervin W. Brink,* Hillsboro, argued the cause for appellant. On the brief were Allen L. Fallgren and Brink & Moore, Hillsboro.

*David O. Bennett,* St. Helens, argued the cause for respondents. On the brief were Bennett & Vagt, St. Helens.

Before PERRY, Chief Justice, and MCALLISTER, GOODWIN, HOLMAN and HAMMOND, Justices.

HAMMOND, J. (Pro Tempore).

This is a suit by the purchasers to require the seller to specifically perform a real estate contract involving property in Vernonia. From a decree of the trial court

declaring the existence of a contract between the parties and requiring the defendant seller to specifically perform the same the defendant appeals.

The parties became acquainted while living on properties that abutted on the rear of each. Plaintiffs, husband and wife, had several children and desired more living space than their then home afforded. The residence owned and occupied by the defendant, an elderly widow, was old but more spacious than that of plaintiffs. The parties were friendly as neighbors and after discussions they entered into a document entitled "Option For Purchase Of Real Estate."

The option agreement was dated October 1, 1961 and granted to plaintiffs the right to purchase the subject property at the agreed price of $4,000 to be paid up on these terms:

"Commencing 1 October 1961, and monthly thereafter, Thirty Dollars ($30.00) monthly in cash, and ($10.00) Ten Dollars monthly in maintenance and upkeep of the property aforesaid, with paid invoice for the latter submitted to First Party, at the earliest convenience of second party.

"If second party elects to purchase the property at the expiration of this option, full credit for the cash, labor and materials paid in shall be given second party as credited toward downpayment; less the cost of taxes, fire insurance and interest at the rate of 6%, all from the date of possession. It is mutually understood and agreed that if Second Party elects to purchase, and Sales Contract is entered into, the interest rate shall be computed at 6% (Six Percent) per annum for the life of the contract; and it is further understood and agreed that second party may exercise their rights in this agreement at any time prior to the expiration date, by payment to the First Party, of an acceptable downpayment * * *."

The agreement further provided that in case the plaintiffs did not elect to purchase the property within two years from October 1, 1961 the agreement was to be null and void and sums received by the defendant were to be retained by her "as fair rental value."

The plaintiffs deny any recollection of signing the option agreement but do not question the genuineness of their signatures thereon. If they ever had a copy thereof they do not so recall.

The plaintiffs moved onto the property on October 1, 1961 and continued to occupy it until October 1965 when possession was given by the plaintiffs to Mrs. Strong's brother, Mr. Peachey, a professional soldier. The latter occupied the property until June 12, 1966 when he was returned to active duty. He left some of his effects stored in trunks and boxes in the house and testified that he locked and nailed the house shut and left. During the same month Mrs. Hall went to the house. She states that she found the kitchen door unlocked and walked in. She took possession of the property on June 15, 1966 and continues in such possession. Mrs. Hall explained the conditions existing prior to her taking possession of the property as follows:

"A In June—the 15th I think. They hadn't paid their rent and I got a notification. I got a notification, a little card, that said 'Let's Keep Vernonia Green and Clean' and they hadn't paid the rent and so I went over to look.

"MR. BENNETT: I still didn't understand the answer.

"A Well, it was just a typed written card that said 'Let's Keep Vernonia Green and Clean' and if you'd have seen the yard you'd have known why I got the card.

"Q And so you went over to the house?

"A I did and that's the first time I ever seen

Mr. Peachey or knew anything about it. And I believe I had to go back three times before I caught him and then I finally caught him there one day."

The occupancy of the property by Mr. Peachey was related to be under an agreement with plaintiffs whereby he was paying them $55 per month. The testimony of Mr. Peachey and Mrs. Strong describes an agreement between them whereby the plaintiffs were selling Peachey their equity in the property. However, when Mrs. Hall visited the house on two occasions before Peachey's departure he simply told her that he was living there and made no mention of any arrangements with the Strongs. Neither did the Strongs mention to Mrs. Hall any arrangement they had with Peachey. In their complaint the plaintiffs refer to Peachey as their tenant in the following allegation:

"* * * during absence from said property by plaintiff's lessee, wrongfully and illegally ousted plaintiffs' tenant from said property and wrongfully and illegally took possession thereof, claiming said property as her own and denying that the plaintiffs have any interest therein."

Plaintiffs contend that they exercised the option contained in their agreement with defendant and that from the date of their election to purchase the property they have been operating under an oral contract of sale, the terms of which they state to be embodied in an unsigned writing prepared at the instruction of the defendant but never executed by any party.

It is undisputed that about October 1, 1963 the plaintiffs informed defendant that they desired to exercise their option under the agreement of October 1, 1961 and that pursuant thereto the defendant had a real estate contract prepared, the scrivener having

used for that purpose a commonly accepted printed form in which the purchase price was stated to be $3,400 payable in the sum of $42 per month including interest at six per cent per annum with the first payment due October 1, 1963. Taxes for the current tax year and all taxes that thereafter became due were to be paid by the purchasers. The remaining provisions of the prepared document were those customarily expected, including a provision that the buildings would be kept insured by the purchasers in an amount not less than $3,500 with loss payable to the seller and buyer as their interests appear, such policies to be delivered to the seller.

Mrs. Hall presented the prepared form to the Strongs for their approval and signature. They expressed no objection to the form or wording except as to the percentage of interest required and in that respect plaintiffs contend that they asked that the interest rate be changed to 5% and that defendant took the form with her and said that she would ask either her realtor or her lawyer about getting it changed to 5% and let the plaintiffs know.

The memories of the parties are inconclusive as to the dates of conversations or the number held regarding the proposed contract but the discussion of interest to be paid apparently terminated with a postcard written by defendant to plaintiffs, postmarked March 11, 1964, in which she said in part:

"* * * Your interest 6 percent for $4000.00 my contract could not get changed so will have to leave yours as is. Will bring it over as soon as I hear from St. Hellens [sic]. Mrs. Rose Hall."

There is no controversy about whether payments were made each month and, in spite of the option agree-

ment having a provision for cash payments of $30 each month, the evidence reveals that payments from plaintiffs to defendant were always $42 per month. The explanation given by Mrs. Strong is disclosed by the transcript as follows:

"Q (By Mr. Bennett) Now did you carry on with Mrs. Hall as far as payments were concerned under the terms of the contract that she had originally given you as far as payments were concerned?
"A Yes.

"Q And what were those payments?
"A $35 a month plus $7 to apply to the taxes."

What payment records are available show receipts therefor issued by defendant have endorsed thereon "Payment on Contract," including the receipt dated February 1, 1964. Available receipts after that date each bear the notation "For Rent of House in Vernonia." There is no evidence that plaintiffs objected to such notation on the receipts given to them. Mrs. Hall explains this way:

"Q Well, hadn't they already told you they were going to sign the contract?
"A Yes, but they didn't do it.

"Q I see. And then so notwithstanding that you operated for five months under the assumption that there was a contract?
"A I did because I give them the receipt for that because they kept saying they were going to sign it and I done everything I possibly could to get them to sign it.
"* * * * *

"Q * * * Now when was it that you told the Strongs that they were paying rent?
"A Right after —. When she throwed that letter in my face.

"Q And you wrote her a letter?
"A I wrote her a letter and I told her that day.

I said now this is it. And I—he come to help me down the steps and I told him the same thing. I said this is it. I have been here four times and this is it."

During plaintiffs' occupancy of the premises they made repairs and improvements to the house and garage. A list of materials purchased and labor hired shows a total expenditure of $2,266.99. Mr. Strong also performed work on the buildings. The majority of the work was done before the final date for exercising the option (October 1, 1963). There is a question regarding the extent to which the expenditures of time and money resulted in improvement to the property. The originally agreed-upon sales price as of October 1, 1963 was $4,000. The plaintiffs testified that they agreed to sell to Peachey late in 1965 or early in 1966 for $5,500. A realtor's testimony put the market value of the property in June 1966 at $5,000.

Plaintiffs do not contend that they paid the taxes on the property for any year since the expiration of the option period but they do claim that the $42 monthly payments made since October 1, 1963 were "$35 a month plus $7 to apply to the taxes." As above noted, the contract form presented to them by defendant, and upon which plaintiffs rely as embodying the claimed agreement between the parties, provides for $42 per month payments upon principal and interest *plus* payment by the buyer of taxes levied in 1963 and thereafter.

Plaintiffs did buy a lot adjoining the subject property for which they paid $78. The transcript does not reveal any connection between that purchase and a reliance upon the claimed contract. The date of such purchase is not disclosed in the record.

The decree from which defendant appeals provides:

"* * * * *

"ORDERED that the agreement and contract for the sale and purchase of said property as the same is presented to this court in Exhibit 2 is determined and confirmed by the court to be the contract for the purchase and sale of said property * * *.

"* * * * *

"ORDERED that the plaintiffs either pay in full the amount to be due and owing upon said contract or pay upon the same as follows: the full amount due and owing thereon for all payments due to date of this decree under the terms of the contract as described in Exhibit 2, and continue thereon at the rate of $42.00 per month, including interest at the rate of 6 percent per annum until said purchase price shall have been paid in full * * *.

"* * * * *."

■ The statute of frauds, ORS 41.580, provides that an agreement for the sale of real property or any interest therein is void unless it, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party to be charged. The claimed contract is within the statute and is therefore invalid and unenforceable unless it appears that to deny the relief prayed for would, in effect, permit the use of the statute of frauds as a cloak for fraud. *Clark v. Portland Trust Bank et al,* 221 Or 339, 351 P2d 51 (1960); *Tiggelbeck v. Russell et al,* 187 Or 554, 213 P2d 156 (1949); 49 Am Jur 732, Statute of Frauds § 427; 81 CJS 537, Specific Performance § 53.

■ There are certain essential prerequisites to the granting of a decree which requires the specific performance of an oral contract for the sale and pur-

chase of real property. Basic to the existence of such a contract is the requirement that the minds of the parties must have met upon each and all of the essential elements of the agreement. *Kretz et ux v. Howard et al*, 220 Or 73, 346 P2d 93 (1959); *Reed et al v. Montgomery*, 180 Or 196, 175 P2d 986 (1947). The court will not make a contract for the parties or supply any material stipulation thereof. *Edwards v. Tobin et al*, 132 Or 38, 284 P 562 (1930); 49 Am Jur 34, Specific Performance § 22.

■ The problem is not simplified by the contention that the oral agreement of the parties has been reduced to writing but left unsigned, for the general rule is that an oral agreement to sign an agreement which the statute of frauds requires to be in writing is invalid and unenforceable. 49 Am Jur 368, Statute of Frauds § 6.

■ Partial performance of an oral contract for the sale of real property may impel a court of equity to take the contract out of the statute of frauds and to require that it be specifically enforced, but such part performance must be unequivocally and exclusively referable to the contract, in the sense that it must, of itself, give rise to an inference of the existence of the contract, and the doing of it must not be susceptible of being otherwise reasonably accounted for, and such part performance must be pursuant to the contract. *Howland v. Iron Fireman Mfg. Co.*, 188 Or 230, 308, 213 P2d 177, 215 P2d 380 (1949); 81 CJS 538, Specific Performance § 54.

Plaintiffs contend that their possession of the property from October 1, 1961 to June 15, 1966 is evidence of the existence of the claimed contract. There is no contention that plaintiffs attempted to exercise their rights under the option agreement until approximately October 1, 1963 and they agree that they were tenants

in the property prior to that date under the terms and conditions of the option agreement. In 49 Am Jur 748, Statute of Frauds § 442, the rule states as follows:

"* * * The continuation of a pre-existing possession initiated under a lease or tenancy, rather than under the oral contract of sale sought to be enforced, is referable to such lease or tenancy rather than to the oral contract, and is not sufficient as a part performance of the latter contract, in the absence of some change in the possession, or of some other act referring the continued possession to the oral contract. A lessee who continues in possession after the expiration of his lease may be supposed to retain the possession, by permission of the landlord, on the terms of the old lease, and therefore, his possession is not considered sufficient evidence of part performance of an agreement to purchase the land."

See also *Dunis v. Director et al,* 121 Or 500, 255 P 474 (1927); *Tonseth v. Larson,* 69 Or 387, 138 P 1080 (1914); *Jenning v. Miller,* 48 Or 201, 85 P 517 (1906); 101 ALR 1018 (1936).

Payments made regularly by plaintiffs and accepted by defendant are claimed to be a part performance of the alleged oral contract. It cannot be said, however, that such payments refer to a contract to sell the property since they remained exactly the same through the initial two-year period of tenancy and the entire period that followed. Defendant testified that $42 per month was a reasonable rental for the property. There was no denial of this. While the option agreement provided for cash payment of $30 per month the actual payment was $42. The parties apparently modified the option agreement by an oral understanding. No other explanation was offered.

■ Purchase of the adjoining lot for $78 is a col-

lateral act, unrelated to the claimed contract. It will be recalled that plaintiffs owned and occupied adjoining property before their initial transaction with defendant. Where the date of the purchase of such lot, the reason for such purchase and the disposition which was made of it, if any, are all unknown, such collateral act cannot serve to take the oral agreement out of the statute of frauds. *Dunis v. Director et al,* supra.

Finally, plaintiffs urge that the repairs and improvements made by them to the buildings on the premises are referable to the claimed contract which they seek to have enforced. Admittedly, the plaintiffs were required to make certain repairs and to keep up the property during their occupancy and at their own expense, the required amount being $10 per month. Their occupancy exceeded 50 months. Another factor is Mrs. Strong's testimony that some of the improvements were necessary to accommodate their family of seven persons. We recognize that it is not uncommon for tenants to make alterations in buildings at their own expense where the same are needed to accommodate the tenants' requirements and where the landlord consents to such alterations being made.

The position taken by plaintiffs must fail unless the acts relied upon by them can be said to be in part performance of and pursuant to the purported contract and that such acts are unequivocally and exclusively referable to the contract, so that such acts are not susceptible of being otherwise reasonably accounted for. *Howland v. Iron Fireman Mfg. Co.,* supra. We hold that payments made to defendant by plaintiffs, the possession of the premises by plaintiffs and the repairs and improvements made to the property by plaintiffs are all susceptible of being accounted for as consistent with defendant's contention that plaintiffs were

tenants and that such acts do not speak of the purported contract.

The decree of the trial court is reversed. Plaintiffs' complaint will be dismissed. Costs to neither party.

McALLISTER, J., concurring.

I concur in the result, but would base the holding simply upon the failure of the plaintiffs to prove that they ever entered into an agreement with the defendant to purchase the property. An agreement is a manifestation of mutual assent by two or more persons to one another. Restatement, Contracts § 3 (1932). The option provided that if it was exercised the parties would enter into a contract of sale. The proof showed that plaintiffs exercised the option, that defendant prepared a contract of sale, that plaintiffs questioned the interest rate and refused to sign, and that the seller refused to rewrite the contract to provide for a lower interest rate. Later the plaintiffs may have changed their minds, but there is no proof that they notified defendant of their willingness to sign the contract as prepared by her. It is no doubt true that the plaintiffs intended to buy the property, if they could, on terms suitable to them, but there is no evidence that the seller intended to sell on the plaintiffs' terms. "There may be circumstances from which a tacit assent may be inferred, but in every case this assent is a fact which must be proved." *Rohr v. Baker,* 13 Or 350, 351, 10 P 627 (1886). In the absence of proof that the parties ever agreed on terms of a contract of sale, the plaintiffs were not entitled to specific performance.